United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY DILLINGHAM,<br><br>            Plaintiff,<br><br>      v.<br><br>T. JOHNSON, et al.,<br><br>            Defendants. | Case No.  13-cv-05777-YGR (PR)<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br><br><br>Dkt. 34 |

## I.      INTRODUCTION

Plaintiff Jerry Dillingham, currently incarcerated at the California Substance Abuse and Treatment Facility, brings the instant *pro se* action, pursuant to 42 U.S.C. § 1983, stemming from alleged constitutional violations that took place while he was incarcerated at Salinas Valley State Prison ("SVSP") from 2012 through 2013, including Eighth Amendment claims resulting from a January 18, 2013 incident in which he was attacked by his cell mate, inmate Lozano.  The operative pleading is Plaintiff's original complaint (Dkt. 1), which the Court has reviewed and has found to have raised cognizable claims against the following Defendants: (1) California Department of Corrections and Rehabilitation ("CDCR") Secretary J. Beard; and (2) the following persons at SVSP: Correctional Officers T. Johnson and D. Moon; Sergeants E. Howard and Warren; Lieutenants R. A. Kessler and E. Medina; Captains V. Solis and R. Mojica; Clinical Psychologist C. Sanders; Appeals Coordinator Mejia; and Warden Randy Grounds.

On February 27, 2015, all of the aforementioned Defendants except for Defendant Mejia (hereinafter "Defendants"), filed a Motion for Summary Judgment.[1]  Dkt. 34.  They argue that (1) the undisputed facts establish that none of the named Defendants were constitutionally liable for the injuries that Plaintiff sustained from the January 18, 2013 incident; (2) Plaintiff failed to exhaust administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA"), 42

_____

[1] Defendant Mejia, who had not yet been served at the time the other Defendants' motion was filed, has since filed a separate motion for summary judgment.  Dkt. 80.  However, that motion has not yet been fully briefed and will be resolved in a separate Order.

United States District Court
Northern District of California

U.S.C. § 1997e(a), as to his claims against Defendants Grounds and Warren; (3) there are no triable disputes regarding Defendants' subjective intent or participation in any alleged constitutional deprivations; and (4) even if constitutional violations had occurred, Defendants are entitled to qualified immunity because they acted reasonably under the circumstances.  *Id.* at 1-2. Accordingly, Defendants argue they are entitled to summary judgment.  *Id.* at 2.  Plaintiff has opposed the motion,[2] and Defendants have filed their reply.  Dkts. 89, 96.

For the reasons outlined below, the Court GRANTS Defendants' motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies as to his claims against Defendants Grounds and Warren, and GRANTS the motion for summary judgment on the merits of his remaining claims.

## II.    DISCUSSION

### A.    Background

#### 1.  Summary of Claims

The following summary of Plaintiff's claims is taken from the Court's October 28, 2014 Order of Service, which states as follows:

> In his complaint, Plaintiff alleges multiple incidents involving various SVSP prison officials.  Specifically, the Court finds that Plaintiff has alleged the following cognizable claims against the following named Defendants:
>
> (1)    a claim of deliberate indifference to Plaintiff's safety in violation of his Eighth Amendment rights, stemming from a January 18, 2013 incident in which he was attacked by his cell mate, inmate Lozano, and Plaintiff has adequately linked Defendants Johnson, Moon, Howard, [Warren], Kessler, Solis, Sanders, Mojica, Medina, [Mejia], Grounds and Beard to his claim;[3]
>
> (2)    Plaintiff's allegations of Defendant Sanders's inadequate mental health care, his refusal to "initiate single cell

---

[2] In opposition to the pending dispositive, Plaintiff has filed a "Separate Statement of Disputed Factual Material Facts Evidence in Opposition to Defendants Summary Judgment Motion," which the Court construes to be his verified opposition. Dkt. 73.  Plaintiff has also filed several verified declarations in opposition to Defendants' declarations filed in support of their motion.  Dkt. 75-79.

[3] Since the issuing of the October 28, 2014 Order of Service, Defendants have informed the Court that the correct spellings of the following Defendants' names are: "Warren" and "Mejia."  Therefore, the Court has indicated the correct spelling of these Defendants' names when quoting to its October 28, 2014 Order of Service Order.

Medical Mental Health treatment care protection" for Plaintiff, and the resulting injury stemming the January 18, 2013 attack present a constitutionally cognizable claim for relief;

(3)     Plaintiff's allegations of Defendant Howard's acts of "intimidation by threats of retaliation through punitively holding up need[ed] ordered urgent [Correctional Treatment Center] transport medical treatment [as a] condition [based] on Plaintiff signing [a] false fraudulent document" after the January 18, 2013 attack present a constitutionally cognizable claim for relief; and

(4)     a claim of a denial of Plaintiff's right to access to the courts against Defendants [Mejia], Mojica, Medina and Beard.

Dkt. 15 at 2 (citing Dkt. 1 at 17-18[4]).

## 2.  Factual Background

### a.  The Parties

At the time of the events set forth in his complaint, Plaintiff was an inmate housed in SVSP.  Dkt. 1 at 1-2.

Defendant Beard is the Secretary of CDCR, and he was appointed on December 27, 2012. *Id.* at 6.  Defendant Grounds was the Warden at SVSP between July 2012 and May 2014. Grounds Decl. ¶ 1.  Defendant Grounds is currently retired.  *Id.*

Defendants Solis, Kessler, Warren, Howard, Moon, and Johnson are or were at the time of the events alleged in Plaintiff's complaint, members of the custody staff at SVSP's Facility A. Dkt. 1 at 3-4, 5-6.  Defendants Medina and Mojica were the Appeals Coordinators for SVSP. Mojica Decl. ¶ 2.  Defendant Sanders was Plaintiff's primary mental health clinician.  Sanders Decl. ¶ 2.

### b.  Plaintiff's Mental-Health Treatment at SVSP and Requests for Single-Cell Housing

Plaintiff was diagnosed with Schizotypal Personality Disorder, and was receiving mental health treatment at the Correctional Clinical Case Management Services level of care at SVSP. Sanders Decl. ¶ 2.  Schizotypal Personality Disorder is defined as a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior.  *Id.*

---

[4] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Plaintiff.

¶ 3.  The disorder is characterized by ideas of reference (i.e., mistaken beliefs that innocuous or coincidental events have strong personal significance), paranoid ideation, magical thinking, odd appearance or grooming, and odd speech patterns (e.g., vague or circumstantial communication). *Id.*  Plaintiff exhibited each of these traits.  *Id.* ¶ 4.  The disorder is treated with cognitive and behavioral psychotherapy ("CBT"), and sometimes with medication.  *Id.*

Defendant Sanders managed Plaintiff's treatment as part of an Interdisciplinary Treatment Team ("IDTT") that included a psychiatrist and a correctional counselor.  *Id.* ¶ 2.  Defendant Sanders and the IDTT developed a treatment plan based on CBT interventions, such as coping skills, social skills, and reality testing.  *Id.*  His treatment also included specific social skills designed to reduce conflicts with other inmates and staff.  *Id.*; Dillingham Depo. 90:17-91:2.3.  Plaintiff testified at his deposition that he had a good relationship with Defendant Sanders, who "helped [Plaintiff] quite a bit."  Dillingham Depo. 82:20-22.

Between February and April 2012, Defendant Sanders saw Plaintiff four times for mental health monitoring and treatment.  Sanders Decl. ¶ 5.  Beginning in April 2012, Defendant Sanders noted that Plaintiff exhibited an increase in paranoid ideation.  *Id.* ¶ 6.  Plaintiff had reported work stress, and believed he was the target of a conspiracy.  *Id.*  Defendant Sanders concluded that Plaintiff should continue with his treatment plan, and provided him with education on coping skills.  *Id.*

By July 2012, Plaintiff's paranoid ideation included a perceived conflict with prison staff.  *Id.* ¶¶ 7-8.  During treatment visits, Plaintiff claimed that "over the years," staff had told other inmates that he was "CIA" and "FBI."  *Id.* ¶ 7.  During one visit, he presented statements from other inmates that purported to corroborate his story.  *Id.* ¶ 8.  Defendant Sanders was aware that Plaintiff had raised these allegations with custody staff, but did not know if they were valid.  *Id.*  Defendant Sanders's clinical concern was that Plaintiff could be distorting reality.  *Id.*

In September 2012, Defendant Sanders found Plaintiff was "embroiled in conspiracy ideation" and was paranoid about being attacked in his cell.  *Id.* ¶ 9.  Defendant Sanders educated Plaintiff on cognitive tools to alleviate paranoia.  *Id.*  Plaintiff testified that he had been hearing voices during this time period, and that Defendant Sanders was helping him understand whether

1   the voices were real.  Dillingham Depo. 19:6-20:10, 22:15-24, 84:10-15.  Plaintiff also requested a

2   single cell.  Sanders Decl. ¶ 9.  To address his request, Defendant Sanders referred Plaintiff to

3   psychiatry for an intervention to help reduce paranoia.  *Id.*

4      Requests for single celling are common among inmates receiving mental health treatment.

5   *Id.* ¶ 10.  Again, no clinical necessity for single-cell housing exists unless the inmate has expressed

6   homicidal intent towards his cellmate.  *Id.*  Moreover, mental-health staff does not have the

7   authority to assign an inmate to single-cell housing.  *Id.*  Such decisions are made by custody staff

8   based on safety and security concerns.  *Id.*  As a last resort, mental-health clinicians may

9   recommend single-cell housing if all other treatment options to assist the inmate have been

10  exhausted.  *Id.*  Whether such a recommendation is necessary is a clinical decision made by the

11  IDTT.  *Id.* ¶¶ 10, 17.

12     Plaintiff met with a psychiatrist, Dr. Jones, on October 10, 2012, regarding his paranoia

13  and single-cell request.  *Id.* ¶ 11.  Dr. Jones diagnosed Plaintiff with Schizotypal Personality

14  Disorder, as well as Anxiety and Depression.  *Id.*  Plaintiff was not on psychiatric medication at

15  that time, but agreed to a trial of Prozac.  *Id.*  Later that month, Defendant Sanders also examined

16  Plaintiff and found him embroiled conspiracy ideation regarding being called a "snitch."  *Id.* ¶ 12.

17  Plaintiff was imagining voices calling him a snitch and a rat.  Dkt. 1 7 at ¶ 5; Dillingham Depo.

18  84:20-85:3.  Defendant Sanders helped him with "reality checks" during this time.  Dillingham

19  Depo. 89:20-90:16.

20     On December 12, 2012, Defendant Sanders examined Plaintiff and found he still showed

21  paranoid ideation and was embroiled in thoughts of conspiracy.  Sanders Decl. ¶ 13.  Plaintiff

22  reported that he was starting to have "problems" with his cellmate, whom he had been housed with

23  for about two months.  *Id.*  Defendant Sanders determined that Plaintiff should continue his

24  treatment plan and work on coping skills to alleviate his paranoia.  *Id.*  He referred Plaintiff to

25  psychiatry for an intervention to help reduce paranoia.  *Id.*  That same day, Plaintiff was assigned a

26  new cellmate, inmate Lozano.  Howard Decl. ¶ 6.  Defendant Sanders did not see Plaintiff again

27  until January 18, 2013.  Sanders Decl. ¶¶ 13-15.

28     On January 10, 2013, Plaintiff was seen by a psychiatrist, Dr. Tusel, regarding his paranoia

United States District Court
Northern District of California

and single-cell request. *Id.* ¶ 14. Dr. Tusel increased Plaintiff's Prozac dosage and provided him with education on coping skills. *Id.*

As mentioned above, on January 18, 2013, Plaintiff was involved in a cell fight with inmate Lozano. *Id.*; Compl. 13 ¶ 35. Defendant Sanders saw Plaintiff in a holding cell following the fight. Sanders Decl. ¶ 15. Plaintiff stated that his cellmate attacked him for being a snitch. *Id.* Defendant Sanders found Plaintiff was exhibiting paranoid ideation and conspiracy ideation. *Id.* Defendant Sanders educated Plaintiff regarding coping skills and set a follow-up. *Id.* Plaintiff testified that before that date, he did not tell Defendant Sanders that about a specific safety concern regarding inmate Lozano, or that Lozano had threatened him. Dillingham Depo. 87-88.

Defendant Sanders examined Plaintiff again during visits on January 25, January 28, and February 7, 2013. Sanders Decl. ¶ 16. Plaintiff reported that his paranoia had increased as a result of the cell fight. *Id.* Plaintiff also claimed that he had a new cellmate who was incompatible. *Id.* Defendant Sanders found that Plaintiff was exhibiting paranoid ideation and was embroiled in thoughts of conspiracy. *Id.* Defendant Sanders educated Plaintiff regarding coping skills, and planned to meet with the IDTT to reevaluate Plaintiff's treatment plan. *Id.*

On February 13, 2013, Defendant Sanders met with Plaintiff's IDTT, including Dr. Tusel and Correctional Counselor Hjelden, to evaluate Plaintiff's treatment plan. *Id.* ¶ 17. The IDTT concluded that Plaintiff's symptoms were not improving with treatment via coping skills and medication. *Id.* His symptoms had caused problems for him at work and with cell mates, and he had recently been involved in a cell fight. *Id.* In light of Plaintiff's ongoing interpersonal problems, and because all other treatment options has been exhausted without success, the IDTT agreed that Plaintiff should be recommended for single-cell housing until his next classification hearing in August 2013. *Id.*

### c. Plaintiff's Bed-Move Requests and January 18, 2013 Incident

#### 1) Inmate Safety Concerns and the Bed-Move-Request Process

Generally, when an inmate reports legitimate security concerns regarding his cellmate, the reporting inmate is secured, interviewed, and placed in protective custody in administrative segregation (ad-seg) pending further investigation. Howard Decl. ¶ 3. If an inmate requires

United States District Court
Northern District of California

emergency attention, they may signal staff at any time by calling out "man down." *Id.* ¶ 7. Floor officers will investigate and inform the Facility Sergeant of the circumstances. *Id.* ¶ 3. If the floor officers determine that legitimate security concerns exist, they will document the evidence. *Id.* The Facility Sergeant will review the documentation to determine if a new housing assignment is necessary. *Id.* If there are genuine security concerns, the inmates may be classified as enemies. *Id.* Enemy classification may require moving one of the inmates to a different facility or even a different institution. *Id.*

In the absence of immediate safety concerns, when an inmate wants to change cellmates or move to a different cell for non-medical reasons, it is considered a "convenience bed move." *Id.* ¶ 4. Cellmate compatibility issues are a common reason for convenience moves. *Id.* An inmate requesting a convenience bed move must complete a Form CDCR 1882A. *Id.* The floor officers will determine if the requested cell move is appropriate. *Id.* This process is necessary to allow staff to account for housing and logistical needs, and relevant security considerations. *Id.* The Program Sergeant will then review and approve the cell move. *Id.* Convenience moves are generally conducted on the weekend after the request is received. *Id.* Inmates, however, can work with the floor officers to accelerate a bed move. *Id.* It is common for inmates to find a compatible potential cellmate on their own, before submitting the bed-move request. *Id.* In such cases, it is possible for a proposed bed move to be reviewed and accommodated that same day. *Id.*

When there is a disturbance or altercation between inmates, facility staff must investigate the incident, determine whether institutional safety and security needs require placing the inmates in ad-seg, and decide whether to file disciplinary charges. *Id.* ¶ 7. The inmates are immediately secured, and barring any exigent circumstances, they are escorted to holding cells in the facility's program office. *Id.* At the holding-cell area, the inmates are first examined by medical staff to document and evaluate any injuries. *Id.* The medical staff complete a Form CDCR 7219 documenting the injuries. *Id.* If medical staff determine that emergency treatment is needed, they inform custody officials and provide the inmate with necessary treatment. *Id.* If the inmates do not require emergent medical attention, they are interviewed along with any other witnesses to determine the nature of the altercation; e.g. whether it was mutual combat or an unprovoked

1    attack.  *Id.*  Physical evidence is also examined, such as records regarding the inmates' injuries.

2    *Id.*

3         Housing in ad-seg may be unnecessary, however, where the inmates genuinely

4    demonstrate that there are no further animosities and they can peacefully coexist in the same

5    facility.  *Id.* ¶ 8.  Inmates can demonstrate this by signing a Form CDC 128-B "compatibility

6    chrono."  *Id.*  After signing the compatibility chrono, the inmates are assigned to different cells,

7    but they may still be housed in the same facility.  *Id.*  Unwillingness to sign the chrono may

8    indicate continuing hostilities or safety concerns.  *Id.*  Thus, the chrono helps to evaluate the

9    seriousness of a dispute between inmates.  *Id.*  If an inmate refuses to sign a compatibility chrono,

10   he is referred to the Program Lieutenant for ad-seg placement for his own safety.  *Id.*

11        Placement in ad-seg housing does not affect the provision of medical care to inmates.  *Id.*

12   ¶ 9.  In fact, a medical examination and clearance is required before an inmate may be placed in

13   ad-seg.  *Id.*  Inmates are also allowed to retain a limited amount of their property in ad-seg

14   housing, including their legal materials, canteen items, and hygiene articles.  *Id.*

15        **2)  Plaintiff Asked Facility Staff to Move His Cellmate to Different Cell**

16            **a)  January 9, 2013 Request to Officer Moon**

17        On January 9, 2013, Officer Moon was on duty as the control-booth officer for Facility A,

18   Building 2.  Moon Decl. ¶ 3.  On that date, Plaintiff gave Officer Moon a CDCR Form 22, Inmate

19   Request for Interview, Item, or Service ("Form 22"),[5] asking that Inmate Lozano be moved to a

20   different cell.  *Id.*; Dkt. 2-1 at 33.  Officer Moon was familiar with Plaintiff, and knew that he had

21   compatibility issues with cellmates and was considered hard to live with.  Moon Decl. ¶ 2.

22   However, Officer Moon was unaware of any past altercations or violence with past cellmates.  *Id.*

23        Plaintiff's Form 22 did not contain any information indicating that he had a legitimate

24   safety concern that required immediate separation from his cellmate.  Moon Decl. ¶ 5.  The Form

25   22 stated that Plaintiff's cellmate, Lozano, "disrespected" Plaintiff using "prohibited language"

26

27        [5] Form 22 is a form upon which inmates may request an interview, item, or service.  Cal.
     Code Regs., tit. 15, § 3086(a).  Therefore, Form 22 facilitates communication between staff and
28   inmates by providing a means for making routine written requests at the initial stages of the appeal
     process.  *See id.*

United States District Court
Northern District of California

8

and "bullying." Dkt. 2-1 at 33. Plaintiff wrote that Lozano should be moved to a different cell to "prevent further disrespectful actions." *Id.* Based on Officer Moon's training and experience, these statements did not demonstrate that Plaintiff's cellmate posed a threat to his safety. Moon Decl. ¶ 5.

Plaintiff told Officer Moon that he wanted a cellmate who was also a Jehovah's Witness. Moon Decl. ¶ 4. Moon offered to call the other buildings to see if there was a more compatible cellmate, but Plaintiff declined. *Id.* He did not express any safety concerns regarding his existing cellmate at that time. *Id.* Officer Moon responded to Plaintiff's Form 22, explaining that he could request a cell move by submitting a bed-move form to the building floor staff for the sergeant's approval. *Id.* ¶ 6. Moon knew that bed moves could usually be accommodated within a few days or fewer. *Id.* Because Plaintiff did not express any safety concerns, Officer Moon did not contact his supervisor regarding Plaintiff's request. *Id.* Officer Moon further instructed Plaintiff to immediately notify the Program Sergeant if he believed he was in any danger. *Id.*

### b) On January 13, 2013 Request to Defendant Johnson

On January 13, 2013, Plaintiff gave Defendant Johnson, a floor officer, a Form 22 requesting that his cellmate, Lozano, be moved to a different cell. Johnson Decl. ¶ 3; Dkt. 2-1 at 36. Plaintiff alleged that one week earlier Lozano had bullied and tried to "incite" him to fight because Plaintiff asked him not to break prison rules in the cell. *Id.* Plaintiff stated that he and Lozano were not "compat[i]ble" or "suitable" as cell mates. *Id.*

Defendant Johnson completed the staff response to Plaintiff's Form 22, and returned the form to him the next day. Johnson Decl. ¶ 4. The response stated that neither Plaintiff nor Lozano had reported any safety concerns, and as a result, one of them needed to complete a CDCR 1882A to request a bed move. Dkt. 2-1 at 36.

Based on his training and experience, Defendant Johnson did not believe that Plaintiff's statements in his Form 22 and actions indicated a legitimate safety concern that required immediate separation. Johnson Decl. ¶ 5. If Plaintiff had expressed legitimate safety concerns regarding his cell mate, he would have been placed into administrative segregation for his protection. *Id.*

Plaintiff's Form 22 did not indicate to Defendant Johnson that Plaintiff was in any immediate danger. *Id.* ¶ 5. Defendant Johnson believed that Plaintiff's request was properly handled as a convenience bed move, which can be processed in a few days or less. *Id.* Because neither inmate voiced safety concerns, Defendant Johnson would not have reported Plaintiff's request to his supervisor. *Id.*

### c)  January 2013 Request to Defendant Solis

In January 2013, Plaintiff met with Defendant Solis in his office regarding his housing concerns. Decl. Solis ¶ 3. The parties, however, dispute the facts regarding the details of this meeting. The following account is based on Defendant Solis's testimony.

During the meeting, Plaintiff indicated that he was requesting a bed move. *Id.* Plaintiff did not communicate any information indicating that his cellmate threatened him or otherwise posed an imminent risk of harm. *Id.* Defendant Solis told Plaintiff that he should discuss the bed move request with the Facility Sergeant. *Id.* No one else was present during this meeting. *Id.*

Defendant Solis did not conduct a computerized check of cell vacancies during this meeting or at any other time. *Id.* Defendant Solis also did not instruct Defendant Warren or any other staff to move Plaintiff's cellmate to another location, or represent that he would do so. *Id.*

Moreover, these are not actions Defendant Solis would have taken because they involve cell move logistics and are specifically delegated to the housing unit floor staff. *Id.*

### 3)  January 18, 2013 Incident Involving Inmate Lozano

On January 18, 2013, Officer J. Avalos reported that at approximately 10:10 a.m., Plaintiff told him that his cellmate, Lozano, punched him several times in the facial area, and that he did not want Lozano back in the cell. Howard Decl. ¶ 11, Ex. A at DEF 11. Officer Avalos escorted Plaintiff to the Facility A Program Office. *Id.*

At 10:56 a.m., medical staff examined Plaintiff for injuries and completed a Form CDCR 7219, Medical Report. *Id.* ¶ 12. The report shows Plaintiff had abrasions, redness, and pain in his face and shoulder area, and a swollen area on his right wrist. *Id.* Plaintiff's injuries did not require emergency treatment. *Id.*; Kumar Decl. ¶ 3. At 11:20 a.m., Plaintiff was also seen by a registered nurse. Kumar Decl. ¶ 4, Ex. A at DEF 1. The nurse provided Plaintiff with ice for pain,

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1   and referred him for a physician evaluation.  *Id.*  The nurse's findings do not reflect that Plaintiff

2   required emergent medical care.  *Id.*

3          Inmate Lozano was also examined by medical staff and found to have abrasions and

4   redness to his neck, right arm and shoulder, and chest.  Howard Decl. ¶ 13, Ex. A at DEF 17.  The

5   medical reports indicated that Plaintiff and Lozano both received injuries consistent with fighting.

6   *Id.* at DEF 11.

7          After Plaintiff and inmate Lozano were seen by medical staff, Defendant Howard

8   interviewed them regarding the fight.  *Id.* ¶ 14, Ex. A at DEF 11.  There were no other staff or

9   inmate witnesses.  *Id.*  The physical evidence showed that both Plaintiff and Lozano received

10  injuries consistent with a cell fight.  *Id.*  Plaintiff and inmate Lozano both signed a CDC 128-B

11  compatibility chrono, admitting that they were involved in a cell fight.  *Id.*, Ex. B.  By signing the

12  chrono, the inmates also agreed that there was no longer animosity between them and that they

13  could continue to coexist on the same facility.  *Id.*  That same day, Lozano was moved to a

14  different cell in Facility A.  *Id.* ¶ 14.  Plaintiff was allowed to remain in his assigned cell.  *Id.*

15         Plaintiff was seen by medical staff at 1:35 p.m. for further evaluation.  Kumar Decl. ¶ 5,

16  Ex. A at DEF 2.  Plaintiff did not appear to be in any distress—he exhibited no shortness of

17  breath, diaphoresis, and could speak in complete sentences.  *Id.* at DEF 3.  He was ambulating,

18  had stable vital signs, and was calm and cooperative.  *Id.*  Abrasions were noted on Plaintiff's face

19  and right forearm.  *Id.*  The nurse marked the encounter as "urgent," which generally refers to

20  treatment needed within 24 hours.  *Id.* at DEF 2.

21         At approximately 2:30 p.m., Plaintiff was examined by Dr. Pajong, who noted injuries to

22  Plaintiff's face and a puncture on his right forearm.  *Id.* ¶ 6, Ex. A at DEF 3, 5.  Dr. Pajong

23  ordered X-rays of Plaintiff's orbits, mandibles, right forearm, and facial bones.  *Id.* at DEF 7-10.

24  The X-ray results were negative for fractures or foreign bodies.  *Id.*  Dr. Pajong also prescribed

25  Plaintiff a single injection of Toradol, an anti-inflammatory drug, and Tylenol for pain.  *Id.* at DEF

26  3-4.  Plaintiff was given antibiotic ointment for his forearm abrasion.  *Id.* at DEF 3.  At

27  approximately 3:00 p.m., Dr. Pajong cleared Plaintiff to return to custody, and Plaintiff was

28  observed ambulating without assistance back to Facility A.  *Id.*  The treatment records do not

indicate that Plaintiff's condition required emergent care.  *Id.*

#### d.  Background Relating to Exhaustion Through Grievances and Correspondence

Defendants have presented Plaintiff's prison records, which they argue prove that he never submitted grievances through the CDCR's administrative grievance process concerning his cognizable claims against Defendant Grounds and Warren.  Dkt. 34 at 15.  They state as follows:

> Dillingham alleged a deliberate-indifference claim against Warden Grounds and Sergeant Warren for failing to protect him from the January 18, 2013 cell attack. But the undisputed facts show that Dillingham failed to exhaust his claims against these Defendants.
>
> Dillingham admitted at his deposition that he never pursued an inmate grievance regarding his claim against Warden Grounds. (Dillingham Depo. 118:13-16.)  His testimony was unequivocal: "That I never did do, I never did file a 602 on Grounds.  Nope, I never did." (*Id.*)  It is undisputed that Dillingham was familiar with the grievance process, and had completed it in the past.  (Medina Decl. ¶ 8, Ex. A; Dillingham Depo. 119-20.)  Because Dillingham never initiated the grievance process against Warden Grounds, he necessarily failed to exhaust his claim.  Cal. Code. Regs., tit. 15, §§ 3084.2(a), 3084.7(d)(3).
>
> It is also undisputed that Dillingham did not initiate the grievance process regarding his claim against Sergeant Warren. Dillingham also admitted that he never filed a Form 602 against Sergeant Warren.  (Dillingham Depo. 110:25-111:4.)  Dillingham submitted a grievance, dated January 16, 2013, regarding Officer Moon and Officer Johnson's refusal to move Inmate Lozano to a different cell.  (Medina Decl. ¶ 11, Ex. B at DEF 26-29.)  But that grievance does not identify Sergeant Warren as a staff member involved with the issue, as required under title 15, section 3084.2(a)(3) of the California Code of Regulations, and therefore cannot exhaust the claim against him.  *See Woodford*[ *v. Ngo*], 548 U.S. [81,] 85, 93-95 [(2006)] (holding that "proper exhaustion" is mandatory and requires adherence to administrative procedural rules).
>
> Warden Grounds and Sergeant Warren are entitled to summary judgment because there is no dispute that Dillingham failed to initiate, and therefore exhaust, the inmate grievance process against them.

*Id.* at 15-16.  Before turning to the facts relating to exhaustion in the present case, the Court briefly reviews the requirements of the PLRA and administrative review process applicable to California prisoners.

### 1)  Legal Framework Relating to Exhaustion

The PLRA requires a prisoner to exhaust "available administrative remedies" before bringing an action with respect to prison conditions.  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion of all "available" remedies is mandatory; those remedies need not meet federal standards, nor must they be "plain, speedy, and effective."  *Booth v. Churner*, 532 U.S. 731, 739-40 (2001).  The PLRA requires *proper* exhaustion of administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 90-91.  Thus, compliance with prison grievance procedures is required by the PLRA to properly exhaust.  *Id.* The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal."  *Id.* at 84.

The CDCR provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).[6]

To initiate an appeal, the inmate or parolee must submit a CDCR Form 602 ("appeal" or "grievance") describing the issue to be appealed to the Appeals Coordinator's office at the institution or parole region for receipt and processing.  *Id.* § 3084.2(a)-(c).  The level of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  The level of specificity required in the appeal is described in the California Code of Regulations as follows:

> The inmate or parolee shall list all staff member(s) involved and

---

[6] The regulations pertaining to the inmate appeal process were amended effective January 28, 2011.  As explained below, Plaintiff's grievances were submitted *after* January 28, 2011; therefore, the amended regulations were in effect and govern his grievances.

United States District Court
Northern District of California

shall describe their involvement in the issue.  To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.

Cal. Code Regs. tit. 15, § 3084.2(a)(3) (emphasis added).  Inmates have "30 calendar days" to submit a grievance (using the prescribed CDCR Form 602) from the "occurrence of the event or the decision being appealed."  *Id.* § 3084.8(b)(1).

The CDCR's appeal process consists of three formal levels of appeals: (1) first formal level appeal filed with one of the institution's appeal coordinators, (2) second formal level appeal filed with the institution head or designee, and (3) third formal level appeal filed with the CDCR director or designee ("Director's Level").  *Id.* §§ 3084.7.[7]  A prisoner exhausts the appeal process when he completes the third level of review.  *Id.* § 3084.1(b); *Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010).

### 2)  Plaintiff's Relevant Appeal History

Plaintiff alleged that he tried to submit three inmate grievances regarding the claims raised in the complaint: (1) a December 17, 2012 health-care appeal regarding Defendant Sanders' mental-health treatment; (2) a January 16, 2013 grievance, alleging that Defendants Moon and Johnson refused to move Plaintiff's cellmate, inmate Lozano, to a different cell; and (3) a January 23, 2013 grievance, alleging that Defendant Howard made Plaintiff sign a false compatibility chrono.  Dkt. 1 at 9 ¶¶ 13-14, 13 ¶¶ 33-34, 15-16 ¶¶ 53-56.  The record does not show that SVSP's Appeals Office received any of these grievances between December 2012 and January 2013.  Medina Decl. ¶ 10.

In approximately October 2013, Plaintiff approached Defendant Medina regarding the status of the alleged January 16 and January 23 grievances.  *Id.* ¶ 11.  He indicated that he never received confirmation that they were accepted for review.  *Id.*  Because it appeared that Plaintiff had attempted to timely submit the grievances, Medina allowed him to re-file them so that he could exhaust the administrative-grievance process.  *Id.*  The January 16, 2013 grievance was

---

[7] Under the regulations, as amended effective January 28, 2011, the informal grievance level has been omitted and there are now only three levels: first level appeal, second level appeal, and third level appeal.  *See* Cal. Code Regs. tit. 15, § 3084.7.

1   assigned log number SVSP-L-13-5800.  *Id.*, Ex. B.  The January 23, 2013 grievance was assigned

2   log number SVSP-L-13-5799.  *Id.*, Ex. C.

3          Plaintiff also alleged that he sent correspondence to Secretary Beard and Warden Grounds

4   informing them of his housing-assignment concerns and problems with the inmate-grievance

5   process. Dkt. 1 at 9 ¶¶ 13-15, 13 ¶ 34; Dkt. 2-1 at 19-20, 25-26.  CDCR personnel responsible for

6   the tracking of inmate correspondence testified that there were no records that Secretary Beard or

7   Warden Grounds received letters from Plaintiff between December 2012 and January 18, 2013.

8   Foster Decl. ¶¶ 2-3; Gutierrez Decl. ¶¶ 2-3.  Neither Secretary Beard nor Warden Grounds

9   personally reviews or responds to inmate correspondence regarding specific custodial issues.  *Id.*

10         **B.    Legal Standard for Summary Judgment**

11         Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment

12   on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P. 56(a)(1).  "The

13   court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

14   material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of

16   establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

17   317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in

18   the record").  If the moving party meets this initial burden, the burden then shifts to the non-

19   moving party to present specific facts showing that there is a genuine issue for trial.  *See Celotex*,

20   477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

21   (1986).

22         The failure to exhaust administrative remedies is an affirmative defense that must be raised

23   in a motion for summary judgment.  *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en

24   banc).  The defendants have the initial burden to prove "that there was an available administrative

25   remedy, and that the prisoner did not exhaust that available remedy."  *Id.* at 1172; *Williams v.*

26   *Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).  If the defendants carry that burden, "the burden

27   shifts to the prisoner to come forward with evidence showing that there is something in his

28   particular case that made the existing and generally available administrative remedies effectively

United States District Court
Northern District of California

1   unavailable to him." *Albino*, 747 F.3d at 1172.  The ultimate burden of proof remains with

2   defendants, however. *Id.* "If material facts are disputed, summary judgment should be denied,

3   and the district judge rather than a jury should determine the facts." *Id.* at 1166.

4        A district court may only consider admissible evidence in ruling on a motion for summary

5   judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

6   In support of the motion for summary judgment, Defendants have presented a transcript of

7   Plaintiff's deposition and all attached exhibits (Dkts. 37-1, 37-2) as well as declarations from the

8   following: Defendants Johnson, Moon, Howard, Medina, Solis, Mojica; Sanders, and Grounds;

9   Defendants' attorney Kevin A. Voth; as well as SVSP Chief Physician and Surgeon Dr. K.

10  Kumar; SVSP Warden's Executive Assistant I. Gutierrez; and SVSP Manager R. Foster (Dkts. 36,

11  38-48).  Meanwhile, Plaintiff has filed his verified complaint (Dkt. 1) as well as his supporting

12  exhibits (Dkt. 2-1), his verified opposition to Defendants' motion (Dkt. 73), and his verified

13  declarations in opposition to Defendants' supporting declarations (Dkts. 75-79).  The Court will

14  construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are

15  based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v.*

16  *McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

17        **C.   Unexhausted Claims**

18        As explained in above, Defendants contend that Plaintiff did not exhaust his administrative

19  remedies as to his deliberate indifference to safety claim against Defendants Grounds and Warren.

20  Dkt. 34 at 15.  Therefore, Defendants argue that they are entitled to summary judgment based on

21  Plaintiff's failure to exhaust his administrative remedies as to his deliberate indifference to safety

22  claim against these two Defendants. *Id.*

23        Defendants have met their ultimate burden as the moving party by setting forth evidence to

24  demonstrate Plaintiff's non-exhaustion as to his deliberate indifference to safety claim against

25  Defendants Grounds and Warren, specifically by taking Plaintiff's sworn deposition, during which

26  he concedes that he never filed grievances against either Defendant.[8]  Dillingham Depo. 110:25-

27  _____

28        [8] *See Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003) (a complaint may be
dismissed by the court for failure to exhaust if a prisoner "conce[des] to nonexhaustion" and "no

United States District Court
Northern District of California

1   111:4; 118:13-16.  Furthermore, the Court finds unavailing Plaintiff's attempts to directly

2   contradict his aforementioned sworn declarations and "recant" his earlier statements conceding

3   that his claim against Defendants Grounds and Warren is unexhausted, dkt. 73 at 2-4, Plaintiff

4   may not manufacture a dispute of fact by an affidavit contradicting his prior deposition testimony.[9]

5   *See Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975).

6       In sum, Defendants have adequately shown that there were available administrative

7   remedies that Plaintiff did not fully exhaust as his deliberate indifference to safety claim against

8   Defendants Grounds and Warren.

9       Accordingly, Defendants are entitled to summary judgment based on the failure to exhaust

10  administrative remedies, and their motion is GRANTED as to the deliberate indifference to safety

11  claim against Defendants Grounds and Warren.

12      **D.    Deliberate Indifference Claim Against Defendant Sanders**

13      Dillingham alleges that Defendant Sanders was deliberately indifferent to his mental health

14  needs based on his refusal to "initiate single cell Medical Mental Health treatment care

15  protection," and the resulting injury stemming from the January 18, 2013 incident involving

16  inmate Lozano.  Dkt. 1 at 5:16-23, 8 ¶¶ 8, 10-11, 17 ¶ 58.

17      Defendants argue that Plaintiff fails to show that, during the course of Defendant Sander's

18  evaluations and treatment, he was deliberately indifferent to Plaintiff's serious medical needs.

19  Dkt. 34 at 17-18.  The Court agrees and finds that Defendant Sanders is entitled to summary

20  judgment on this claim.

21      The Eighth Amendment protects prisoners from inhumane conditions of confinement.

22  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  In order to prevail on an Eighth Amendment

23  claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious

24  _____

25  exception to exhaustion applies").
        [9] In any event, with regard to Defendant Warren, Plaintiff claims that he submitted a

26  grievance against this Defendant on January 2, 2014.  Dkt. 73 at 2-3.  However, because the
    instant action as filed almost a month earlier—on December 13, 2013—the January 2, 2014

27  grievances cannot exhaust the claim against Defendant Warren.  *See McKinney v. Carey*, 311 F.3d
    1198, 1199 (9th Cir. 2002) (An action must be dismissed unless the prisoner exhausted his

28  available administrative remedies *before* he filed suit, even if the prisoner fully exhausts while the
    suit is pending.).

1 medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "This includes 'both an objective

2 standard—that the deprivation was serious enough to constitute cruel and unusual punishment—

3 and a subjective standard—deliberate indifference.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066

4 (9th Cir. 2014) (citation omitted).  To meet the objective element of the standard, a plaintiff must

5 demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104.  To satisfy the

6 subjective element, the plaintiff must show that "the official knows of and disregards an excessive

7 risk to inmate health or safety; the official must both be aware of facts from which the inference

8 could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

9 *Farmer*, 511 U.S. at 837; *see McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir.1992) ("A

10 defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need

11 in order for deliberate indifference to be established."), *overruled on other grounds by WMX

12 Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

13     Here, with regard to the issue of whether Plaintiff had a serious medical or mental health

14 need, Defendants do not dispute that Plaintiff's mental health condition amounted to serious

15 mental health needs.

16     As to the second element of a deliberate indifference claim, Plaintiff has failed to raise a

17 genuine issue of material fact regarding Defendants' response to his medical needs.  As noted, a

18 prison official is deliberately indifferent under the subjective element of the applicable test only if

19 the official "knows of and disregards an excessive risk to inmate health and safety."  *Toguchi v.

20 Chung*, 391 F.3d 1051, 1056 (9th Cir. 2004).  Here, the record does not support such a finding.

21     The undisputed facts establish that, fundamentally, the decision to recommend single-cell

22 housing under the circumstances here is a clinical judgment based on an inmate's mental health

23 condition and treatment progress.  Sanders Decl. ¶¶ 10, 17.  On September 2012, Plaintiff started

24 requesting single-cell housing during treatment with Defendant Sanders.  *Id.* ¶¶ 9-13.  A single-

25 cell recommendation is not clinically appropriate except as a last resort, when all treatment options

26 have been exhausted and the inmate does not show improvement.  *Id.* ¶ 10, 18.  No clinical

27 necessity for single-cell housing exists unless the inmate expresses homicidal intent towards his

28 cellmate.  *Id.* ¶ 10.  Defendant Sanders opined that, between September 2012 and January 2013,

United States District Court
Northern District of California

1   Plaintiff had not yet exhausted all treatment options.  *Id.* ¶ 18.

2          Far from purposefully ignoring or failing to respond to Plaintiff's complaints relating to his

3   mental-health needs, the undisputed record shows that Plaintiff received prompt and consistent

4   treatment.  Throughout the time period of September 2012 through January 2013, Defendant

5   Sanders addressed Plaintiff's various mental-health needs, including his housing concerns.

6   Defendant Sanders continued to treat Plaintiff using CBT interventions, and referred him to

7   psychiatry to alleviate paranoia.  *Id.* ¶¶ 9-13. Plaintiff admitted that Defendant Sanders never

8   refused to see him, and provided treatment "the best he could."  Dillingham Depo. 91:10-20.

9   Further, Plaintiff's psychiatrists prescribed medications to help with his symptoms.  Sanders Decl.

10  ¶¶ 12, 14.

11         After the January 18, 2013 incident, Defendant Sanders visited Plaintiff multiple times and

12  found that his paranoid ideation continued to increase.  *Id.* ¶ 16.  Defendant Sanders met with the

13  IDTT to revisit Plaintiff's treatment plan, and concluded that Plaintiff was not improving.  *Id.*

14  ¶ 17.  Because Plaintiff had exhausted his treatment options, the IDTT recommended a temporary

15  placement in single-cell housing.  *Id.*

16         In sum, no evidence exists showing that Defendant Sanders purposefully ignored

17  Plaintiff's complaints of relating to his mental health needs or need for a single-cell assignment.

18  To the contrary, the record demonstrates that Defendant Sanders and the medical staff promptly

19  and consistently responded to Plaintiff's complaints.  While the course of treatment may not have

20  been precisely what Plaintiff requested or desired, a mere difference of opinions regarding the

21  course of medical treatment fails to state a claim for deliberate indifference.  *See Toguchi*, 391

22  F.3d at 1058, 1059-60; *Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir.

23  1981).  Furthermore, no genuine dispute of material fact exists regarding whether Defendant

24  Sanders's treatment decisions were clinically unacceptable under the circumstances.  The record

25  shows no indication whatsoever that single cell status was medically necessary for Plaintiff.

26  While Plaintiff was involved in a fight with his cellmate on January 18, 2013, after Defendant

27  Sanders's decision not to recommend a single-cell assignment, Plaintiff at most states a medical

28  negligence claim against Defendant Sanders, which is not cognizable under section 1983.  *See*

*Farmer*, 511 U.S. at 835-36 & n.4 (Neither negligence nor gross negligence will constitute deliberate indifference.).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim to his mental health needs against Defendant Sanders.

### E.    Safety Needs Claim

The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures for the safety of inmates.  *See Farmer*, 511 U.S. at 834.  In particular, officials have a duty to protect inmates from violence at the hands of other inmates.  *See id.* at 833.  A prison official violates the Eighth Amendment only when two requirements are met:  (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety.  *See id.* at 834.

To be liable in a failure to prevent harm situation, the official must know of and disregard an excessive risk to inmate safety.  *See id.* at 837.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *See id.*  He need not "'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault.'"  *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted).  Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur.  *Id.*; *see, e.g.*, *id.* at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages."  *Id.*  In the former case, a broader and more generalized approach to causation is taken.  *See id.*

When  plaintiffs,  such  as  the  inmates,  seek  to  hold  an  individual

20

defendant personally liable for damages, the causation inquiry between the deliberate indifference and the [E]ighth [A]mendment deprivation must be more refined.  We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference.  In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant.  Especially when . . . a prisoner seeks to hold a prison employee individually liable because another prisoner attacked him, the prisoner must establish individual fault.  Sweeping conclusory allegations will not suffice to prevent summary judgment.  . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted).

The dispute here focuses on the mental state of each Defendant when each acted. Defendants more than met their initial burden on summary judgment.

Here, the evidence demonstrates that Defendants Beard, Medina, Mojica, Sanders, Howard and Kessler did not know, and could not have known, that Plaintiff's safety was at risk on January 18, 2013, as explained below.  Meanwhile, while Plaintiff has presented evidence that he alerted Defendants Solis, Moon and Johnson to inmate Lozano's perceived threat to Plaintiff's safety, the record shows that these Defendants did not possess the requisite mental state, i.e., that they each were subjectively, deliberately indifferent to the inmate's safety.

### 1. Defendant Beard

Plaintiff claimed that he sent a letter to Defendant Beard asking for protection from Inmate Lozano.  Dkt. 1 at 9 ¶¶ 13, 15; Dkt. 2-1 at 19-20, 25-26; *see also* Dillingham Depo. 73:25-74:10, Ex. 9, 116-17, Ex. 12.  CDCR staff testified that under their respective offices' administrative policies, Defendant Beard did not personally review or respond to inmate correspondence regarding specific custodial issues.  Foster Decl. ¶¶ 2-3; Gutierrez Decl. ¶¶ 2-3.

All inmate letters raising custodial issues that are addressed to Defendant Beard are processed by the Controlled Correspondence Unit ("CCU"), and routed to the Division of Adult Institutions for a response.  Foster Decl. ¶¶ 2-3.  CCU records show that no letters were received from Plaintiff regarding any issue in December 2012 and January 2013.  *Id.*  Plaintiff testified that the only reason he believed Defendant Beard received his letter is because Plaintiff addressed the letter to Defendant Beard.  Dillingham Depo. 129:2-18.

In addition, there can be no dispute that Plaintiff's purported letter sent to Defendant Beard, even if received, would not have put them on notice regarding an excessive risk of danger. The letters focus exclusively on perceived problems with the inmate-grievance process. Dkt. 2-1 at 19-20, 24-25. The letter does not mention allegations of safety concerns or threats of violence regarding Plaintiff's cellmate. *Id.* Accordingly, no triable issue exists regarding whether Defendant Beard was deliberately indifferent to a risk of harm posed by inmate Lozano.

### 2. Defendants Mojica and Medina

Plaintiff also alleged that he made Defendants Mojica and Medina (both appeals coordinators) aware that his cellmate assignment was a threat to his safety. Specifically, Plaintiff claims that before the January 18, 2013 incident, he sent Defendant Medina and Mojica two inmate appeals: (1) a December 17, 2012 health-care appeal regarding Defendant Sanders's mental health treatment; and (2) a January 16, 2013 grievance, alleging that Defendants Moon and Johnson refused to move inmate Lozano to a different cell. Dkt. 1 at 9 ¶¶ 13-14, 13 ¶¶ 33-34.

Regarding the December 17 health-care appeal, Plaintiff testified that he addressed and mailed that appeal to the prison's Health Care Appeals Office—not the non-medical Appeals Office where Defendant Medina and Mojica worked. Dillingham Depo. 125-26. Therefore, Plaintiff has essentially admitted that he had no rational reason to believe Defendant Mojica or Medina would have received that appeal. *Id.* Plaintiff testified that he did not know who the health-care appeals coordinator was or where the health-care appeals office was located. *Id.*

Regarding the January 16, 2013 grievance, Defendants Mojica and Medina have presented uncontroverted evidence that the Appeals Office never received that grievance until several months later in October 2013. Medina Decl. ¶ 10; Mojica Decl. ¶ 5. Plaintiff testified that his only proof connecting Defendants Medina and Mojica to the grievance was that he addressed the grievance to the Appeals Office, and that the institutional mail is "foolproof." Dillingham Depo. 124-25. Plaintiff's speculative testimony does not refute Defendants' direct evidence that this second grievance was not received until *after* the January 18, 2013 incident. Accordingly, no triable issue exists regarding whether Defendants Mojica and Medina were deliberately indifferent to a risk of harm posed by inmate Lozano.

### 3. Defendant Sanders

The undisputed evidence also shows that Defendant Sanders was not aware of any specific threat to Plaintiff's safety that inmate Lozano may have posed. First, inmate Lozano did not become Plaintiff's cellmate until December 12, 2012. Howard Decl. ¶ 6. That date was also the last time that Defendant Sanders visited Plaintiff regarding his treatment before the January 18, 2013 incident. Sanders Decl. ¶¶ 13-15. Plaintiff admitted that, before the cell fight, he never told Defendant Sanders that inmate Lozano had threatened him or that he had serious safety concerns. Dillingham Depo. 86-87. Accordingly, no triable issue exists regarding whether Defendant Sanders was deliberately indifferent to a risk of harm posed by inmate Lozano.

### 4. Defendant Solis

Plaintiff alleged that on January 14, 2013, Defendant Solis met with him to discuss his concerns regarding inmate Lozano. Dkt. 1 at 12 ¶¶ 27-30. During the meeting, Plaintiff alleges that Defendant Solis listened to his concerns and concluded that he had safety concerns regarding inmate Lozano. *Id.* at 12 ¶ 29. Plaintiff claims Defendant Solis ran a computerized search for cell vacancies, called in Defendant Warren, and Defendant Warren to move inmate Lozano to a different cell. *Id.* However, inmate Lozano was not moved, and they fought four days later.

Defendant Solis claims that such a meeting did take place, but he disputes the details of the meeting that Plaintiff alleged above. Specifically, Defendant Solis denies that Plaintiff expressed safety concerns, that he ran a computer check for cell vacancies, that Defendant Warren was present, or that he instructed Defendant Warren to move inmate Lozano. Decl. Solis ¶¶ 3-4. Nevertheless, Plaintiff's deliberate indifference claim necessarily fails because, even if his allegations were true, they would not establish an Eighth Amendment violation.

As alleged, Defendant Solis did not disregard Plaintiff's purported safety concerns. Rather, if Plaintiff's version is to be believed, Defendant Solis acted reasonably in response to safety concerns about inmate Lozano. He located cell vacancies, and made arrangements to have inmate Lozano moved to a different cell. The mere fact that inmate Lozano was not moved within the following four days does not demonstrate that Defendant Solis acted with "criminal recklessness." *See Farmer*, 511 U.S. at 844 (prison officials are free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted).

Plaintiff's case is analogous to the case of *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155 (9th Cir. 2013). In *Labatad*, the Ninth Circuit affirmed summary judgment in favor of prison officials against a deliberate indifference claim from an inmate who was assaulted by a member of a rival prison gang with whom he was temporarily assigned to share a cell in a prison that did not house rival gangs separately. *Id.* at 1157. The plaintiff in *Labatad* was a gang member and fought with a member of another gang, after which both combatants told prison investigators that the fight was not gang related and that they had no further issues. *Id.* Plaintiff then was put in ad-seg and assigned to share a cell with another inmate from the same gang as the inmate with whom plaintiff had just fought. *Id.* There had been (i) no difficulties with the new cellmate during the extended period both had been in general population and (ii) no threats from the new cellmate. *Id.* Further, the new cellmate was not identified as an enemy or risk to the plaintiff. *Id.* Three days after moving in, the new cellmate assaulted the plaintiff. *Id.* The attacking cellmate later said that he assaulted plaintiff because they were from different gangs and thought he (the cellmate) would be attacked unless he did so first. *Id.* The Ninth Circuit concluded that the evidence was insufficient to preclude summary judgment on the claim that prison officials were deliberately indifferent to a substantial risk that the new cellmate would assault plaintiff if the two were housed in the same cell. *Id.* at 1161. The court noted the absence of prior conflict between plaintiff and the new cellmate and the assurances that the earlier fight was not gang related. *Id.* at 1161. The court rejected the plaintiff's argument that his "evidence that he told [a prison] officer that he should not be housed with [the new cellmate]" was sufficient to defeat summary judgment; plaintiff had not specified who he told or what he told them to raise a triable issue "that the defendants knew of facts supporting an inference and drew the inference of a substantial risk to [plaintiff] if he was placed in a cell with" the new cellmate. *Id.* Plaintiff's case is like *Labatad* in that there was no evidence of prior conflict between Plaintiff and inmate Lozano, and inmate Lozano had not been listed as an enemy of Plaintiff. Unlike *Labatad*, evidence exists as to what Plaintiff said when he asked to be moved away from inmate Lozano, but those statements are not sufficient to raise a triable issue "that the defendants knew of facts supporting an inference and

24

drew the inference of a substantial risk to [Plaintiff] if he was placed in a cell with" inmate Lozano. *Id.*

Analysis of the present case also is guided also by the dissimilarities between Plaintiff's facts and those in *Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015), a case in which the Ninth Circuit reversed the grant of summary judgment on a deliberate indifference claim from an inmate who was attacked by two fellow inmates while all three were being escorted through a dangerous part of the prison by a single guard.  In *Cortez*, sufficient evidence existed to support a finding of deliberate indifference by the defendant who had attempted to escort the three inmates single-handedly namely, evidence that (i) the officer knew about the hostility between the inmates based on the inmates' harassing conversation, (ii) the officer was aware of the plaintiff's protective custody status, and (iii) the officer knew prison policy required leg restraints for these inmates during escort but did not put them in leg restraints.  *See id.* at 1052-53.  By contrast, in Plaintiff's case, no comparable facts exist here to have made Defendant Solis aware of the risk: again, no evidence that inmate Lozano engaged in harassing conversation with Plaintiff or otherwise expressed hostility toward Plaintiff; no evidence that Plaintiff was a protected custody inmate; and no evidence that Defendant Solis knew of a policy contrary to the steps taken.

Even if Plaintiff asked for a cell move and mentioned safety concerns, Defendants contend no evidence exists that Defendant Solis responded unreasonably to Plaintiff's concerns and requests.  The Court agrees.  The record shows an absence of evidence from which a reasonable jury could conclude that Defendants knew a safety risk existed for Plaintiff if they left him in the same cell as inmate Lozano for a few more days after the move request was made.  When the evidence is viewed in the light most favorable to Plaintiff, and inferences therefrom drawn in his favor, a reasonable jury could not find that Defendant Solis was deliberately indifferent to a known risk to Plaintiff's safety.  Defendants are entitled to summary judgment in their favor because Plaintiff has not established a genuine issue for trial as to whether Defendant Solis was deliberately indifferent to a risk to his safety.  *See Celotex*, 477 U.S. at 324.

### 5.  Defendants Moon and Johnson

Plaintiff alleges that Defendants Moon and Johnson (both correctional officers) acted with

United States District Court
Northern District of California

deliberate indifference because they did not immediately move inmate Lozano to another cell when Plaintiff asked them to do so.  Dkt. 1 at 10 ¶ 21, 11 ¶ 25.  However, a prison official's housing decision does not violate the Eighth Amendment merely because it arguably increases the risk of harm to a prisoner.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051 (9th Cir. 2002).  Such a decision is unconstitutionally deliberately indifferent only if the risk of harm from the decision to house an inmate with other dangerous inmates "changes from being a risk of some harm to a substantial risk of serious harm."  *Id.*

It is undisputed that on January 9, 2013, Plaintiff gave each officer a Form 22, that vaguely described incidents of inmate Lozano's "bullying," "disrespectful language," and attempts to "incite" Plaintiff.  Moon Decl. ¶ 6; Johnson Decl. ¶ 5; Pl.'s Supp. Exs. 33, 36.  Plaintiff further testified that he told Officer Moon that inmate Lozano "insinuated" that he was going to beat Plaintiff.  Dillingham Depo 96:5:16.  Plaintiff allegedly also told Moon and Johnson that his "cellie was threatening me, bullying me."  *Id.* at 96:21-24, 103:21-24.  Even assuming Plaintiff's testimony is true, no genuine dispute exists regarding whether his cryptic Form 22 statements and vague claims of threats and "insinuations" could establish more than a mere suspicion that an attack would occur.  *Berg*, 794 F.2d at 459.

Just like in the Court's analysis above relating to Defendant Solis, the Court finds Plaintiff's claim against Defendants Moon and Johnson analogous to the claim in *Labatad*; however, the facts against these Defendants are even *less* compelling than in *Labatad*, where, again, the Ninth Circuit held that celling rival gang members together, without more, did not demonstrate deliberate indifference to the inmates' safety.  714 F.3d at 1160.  Notably, in *Labatad*, the plaintiff had even fought with a member of his cellmate's gang a few days before the incident at issue.  *Id.*  Nevertheless, the court found this knowledge insufficient to show that prison officials were deliberately indifferent to a substantial risk of harm.  *Id.* at 1161.

Taking into account the realities of prison life, Defendants Moon and Johnson responded reasonably to the risk of harm.  *See Farmer*, 511 U.S. at 836.  Both officers responded to Plaintiff's request within 24 hours, and instructed Plaintiff to complete a bed-move request form.  Moon Decl. ¶ 6; Johnson Decl. ¶ 4.  Both officers knew that bed-move requests could be

United States District Court
Northern District of California

United States District Court
Northern District of California

accommodated in a few days or fewer.  Moon Decl. ¶ 6; Johnson Decl. ¶ 2.  Despite the counseling, Plaintiff admits that he never completed the required form.  Dillingham Depo. 100:6-7.  It is also undisputed that Plaintiff did not act in a manner that was consistent with having legitimate safety concerns.  Moon Decl. ¶ 8; Johnson Decl. ¶ 6.  He did not file an emergency inmate grievance.  Dillingham Depo. 101-02.  Plaintiff was also willing to return to his cell with inmate Lozano.  Moreover, nothing in the record indicates that Plaintiff made any other efforts to address a safety concern between January 9, when he talked to Defendant Moon, and January 14, when he talked to Defendant Johnson.  Understood in this context, Defendants Moon and Johnson were, at most, negligent in exercising their custodial judgment regarding Plaintiff's cellmate assignment, which is not enough to establish an Eighth Amendment violation.  *See Farmer*, 511 U.S. at 835-36 & n.4.

Accordingly, Plaintiff has failed to create a triable issue of fact that Defendants Moon and Johnson were deliberately indifferent to a substantial risk of harm.  Therefore, these Defendants are entitled to summary judgment.  *See Labatad*, 714 F.3d at 1160.

### 6.  Defendants Howard and Kessler

Plaintiff alleges that Defendants Howard and Kessler (a sergeant and a lieutenant, respectively) also had foreknowledge of inmate Lozano's perceived threat to Plaintiff's safety.  However, Plaintiff's testimony establishes that he lacks any facts or evidence demonstrating that either Defendant Howard or Defendant Kessler possessed the requisite knowledge and mental state.

First, Plaintiff testified that he believed that, after he gave the aforementioned January 9, 2013 Form 22 to Defendants Moon and Johnson, they were obligated to contact the program office and relay the information to a supervisor.  Dillingham Depo. 59-60, 60:5-19, 114-115.  Plaintiff attributed this to "personal knowledge," but offered no factual basis for his belief, citing only "policy and procedures."  *Id.* at 60:5-19, 115:6-9.  Moreover, Defendants Moon and Johnson each testified that they did not contact their supervisors after receiving Plaintiff's Forms 22.  Moon Decl. ¶ 6; Johnson Decl. ¶ 5.

In any case, Plaintiff admitted that he had no way to know whether Defendant Howard

United States District Court
Northern District of California

1    actually knew about Plaintiff's safety concerns relating to inmate Lozano before January 18.  *Id.* at

2    64:9-18.  Similarly, at his deposition, Plaintiff could not point to any facts or evidence showing

3    that Defendant Kessler knew that inmate Lozano was allegedly threatening him.  *Id.* at 115.

4    Rather, Plaintiff's testimony reveals that his deliberate indifference claims against Defendants

5    Howard and Kessler are based on speculative assumptions and layers of inferences, which the

6    Court finds is insufficient here to raise genuine issues of fact and defeat summary judgment.  *See*

7    *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

8         Even assuming that Defendants Moon and Johnson conveyed Plaintiff's allegations to

9    Defendant Howard or Defendant Kessler, this would not raise a triable issue as to whether they

10   were aware of an excessive or intolerable risk of serious harm.  As previously explained,

11   Plaintiff's vague claims of threats and insinuations cannot establish more than a mere suspicion

12   that an attack would occur. *See Berg*, 794 F.2d at 459; *Labatad*, 714 F.3d at 1160.  Accordingly,

13   Defendants Howard and Kessler are entitled to summary judgment.

14        In sum, a triable issue does not exist regarding whether inmate Lozano was known to any

15   defendant to be a danger to Plaintiff prior to the January 18, 2013 incident.  When the evidence is

16   viewed in the light most favorable to Plaintiff, and inferences therefrom drawn in his favor, a

17   reasonable jury could not find that Defendants were deliberately indifferent to a known risk to

18   Plaintiff's safety.  Therefore, Defendants Beard, Medina, Mojica, Sanders, Howard, Kessler, Solis,

19   Moon, and Johnson are entitled to judgment as a matter of law on the Eighth Amendment claim of

20   deliberate indifference to Plaintiff's safety needs.  *See Celotex*, 477 U.S. at 323.

21   **F.    Claims Against Defendant Howard Arising From Post-Fight Interview And
22         Compatibility Chrono**

23        **1.    Medical Needs Claim**

24        Plaintiff alleged that after the January 18, 2013 incident, Defendant Howard intentionally

25   delayed "emergency medical treatment" until Plaintiff agreed to sign a compatibility chrono.  Dkt.

26   1 at 14, ¶¶ 44-45.  Based on the undisputed facts, medical personnel found that Plaintiff did not

27   need emergent care for his injuries, and thus, Defendant Howard did not deliberately delay needed

28   emergency treatment.  *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1084 (9th Cir.

1   2013) (a prison official that reasonably relies on the opinion of medical staff does not act with

2   deliberate indifference).

3        The record demonstrates that medical personnel examined Plaintiff and evaluated and

4   documented his injuries as soon as he arrived in the program office, before Defendant Howard

5   interviewed him.  Dkt. 1 at 13 ¶ 38, 14 ¶ 39; Howard Decl. ¶¶ 11-12, Ex. A at DEF 18.  Dr. Kumar

6   reviewed Plaintiff's medical records and determined that he did not present injuries that required

7   emergent care.  Kumar Decl. ¶ 3.  He had some reddened areas, abrasions, pain, and some

8   swelling around a puncture on his right wrist.  *Id.* ¶¶ 3, 5.  The evidence does not show any major

9   trauma, such as active bleeding, lacerations, or cuts.  *Id.*  A mere 20 minutes later, the triage nurse

10  provided Plaintiff with additional treatment.  *Id.* ¶ 4.  The nurse provided Plaintiff with ice and

11  referred him for a physician evaluation and x-rays.  *Id.*  Plaintiff received ointment for his

12  puncture wound.  *Id.* ¶ 7.  Subsequent exams that same day confirmed that Plaintiff did not need

13  emergency care, and that the brief delay in his treatment caused no further injury.  *Id.* ¶¶ 4-7.

14       In light of the uncontroverted medical evidence above, Plaintiff's belief that he needed

15  additional emergency treatment does not create a genuine dispute of material fact regarding his

16  deliberate indifference claim.  *See Toguchi*, 391 F.3d and 1057.  Nor can his allegation that the

17  examining nurse told him he needed emergency care.  Dkt. 1 at 14 ¶ 39.  At most, the nurse's

18  hearsay statement shows a difference of opinion between medical professionals, which also does

19  not suffice to demonstrate deliberate indifference.  *See Toguchi*, 391 F.3d and 1057.

20       Defendant Howard testified that following a disturbance between inmates that is not an

21  obvious emergency, the inmates are always examined first by medical staff for injuries.  Howard

22  Decl. ¶ 7.  Defendant Howard relies on the medical judgment of the medical staff regarding

23  whether immediate treatment is needed.  *Id.* ¶ 17.  In such cases, medical staff will provide all

24  necessary treatment and inform custody staff.  *Id.* ¶ 7.  Here, medical staff did not indicate that

25  Plaintiff needed immediate treatment, and Defendant Howard reasonably relied on that judgment.

26  *See Lemire*, 726 F.3d at 1084.  Accordingly, Defendants are entitled to summary judgment on

27  Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim against

28  Defendant Howard.

United States District Court
Northern District of California

## 2.  First Amendment Claim

Plaintiff cites the First Amendment and alleges that Defendant Howard engaged in "acts of intimidation by threats of retaliation" regarding his medical care and the compatibility chrono. Dkt. 1 at 17 ¶ 59.  To the extent this Court found a cognizable First Amendment claim, the undisputed facts demonstrate that such a claim necessarily fails.

First, although Plaintiff uses the word "retaliation," he cannot actually establish a First Amendment retaliation claim.  To establish a claim of retaliation under section 1983, an inmate must show that protected First Amendment conduct was the but-for cause of the defendant's retaliatory action.  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  Here, Plaintiff admitted that Defendant Howard's "threats of retaliation" were unrelated to any First Amendment conduct. Dillingham Depo. 59-60.  Plaintiff speculated that Defendant Howard wanted him to sign the compatibility chrono to "cover up" his failure to address Plaintiff's concerns about safety issues relating to inmate Lozano.  *Id.*  Plaintiff ultimately conceded that he knew of no facts to prove Defendant Howard's motivation.  *Id.* at 60:16-19.  Accordingly, Plaintiff cannot establish a retaliation claim against Defendant Howard.

Second, Plaintiff also alleges that Defendant Howard threatened to put Plaintiff in segregation and separate him from his legal property.  Dkt. 1 at 14 ¶ 43.  To the extent that Plaintiff contends that this raises an access to the courts type of claim, his efforts also fail.  An access to the courts claim must demonstrate an actual injury; i.e. prejudice regarding existing or contemplated litigation, such as a missed filing deadline.  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).  Here, Plaintiff cannot establish an actual injury arising from the alleged threat. Plaintiff testified that, at the time of Defendant Howard's interview, he had no pending litigation deadlines that were affected.  Dillingham Depo. 77:15-23.  Accordingly, Plaintiff cannot sustain an access to the courts claim against Defendant Howard.

## 3.  Equal Protection Claim

Plaintiff's complaint contains a conclusory allegation that Defendant Howard singled him out based on his race and mental-health status.  Dkt. 1 at 17 ¶ 59.  Plaintiff sets forth no other facts regarding this claim in his complaint.  To the extent Plaintiff seeks to raise an equal protection

1    claim against Defendant Howard, his claim lacks merit.

2         To succeed on an equal protection claim, a plaintiff must show that officials intentionally

3    acted in a discriminatory manner. *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991). During

4    his deposition, Plaintiff admitted that he had no factual basis to believe that Defendant Howard

5    discriminated against him on account of his race or mental-health status. Dillingham Depo. 62:6-

6    63:15. Plaintiff testified that he did not know what motivated Defendant Howard's actions, but

7    assumed it was race because "[h]e just so happened to have been a white guy, I just so happened to

8    be a colored man." *Id.* at 62:17-18, 63:9-12. Thus, it is undisputed that Plaintiff's claim is based

9    solely on speculation regarding Defendant Howard's alleged intent. Accordingly, the Court finds

10   that Plaintiff's equal protection claim fails. *See Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir.

11   2003) (holding that to avoid summary judgment, plaintiff must produce evidence sufficient to

12   permit reasonable trier of fact to find by preponderance of the evidence that challenged conduct

13   was motivated by discriminatory intent); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th

14   Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of

15   summary judgment.").

16       **G.    Claim of Denial of Access to the Courts Against Defendants Beard, Medina, and
                 Mojica**

17        Plaintiff alleged that Defendants Beard, Medina, and Mojica obstructed his access to the

18   prison's grievance process regarding the claims at issue in this case. Dkt. 1 at 17 ¶ 61.

19   Specifically, Plaintiff claims Defendants Medina and Mojica obstructed three inmate appeals: (1) a

20   December 17, 2012 health-care appeal regarding Defendant Sanders's treatment of Plaintiff's

21   mental health issues; (2) a January 16, 2013 grievance, alleging that Defendants Moon and

22   Johnson refused to move inmate Lozano to a different cell; and (3) a January 23, 2013 grievance,

23   alleging that Defendant Howard made Plaintiff sign a false compatibility chrono. *Id.* at 9 ¶¶ 13-

24   14; 13 ¶¶ 33-34; 15-16 ¶¶ 53-56. Plaintiff alleged that Defendant Beard knew that Defendants

25   Mojica and Medina were obstructing his access to the grievance system. *Id.* at 16 ¶ 56.

26        Prisoners have a constitutional right of access to the courts. *Lewis v. Casey*, 518 U.S. 343,

27   350 (1996). An inmate's right to meaningful access to the courts extends to established prison

28

United States District Court
Northern District of California

grievance procedures. *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir. 1995) *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223 (2001). To establish a claim for a violation of this right, the prisoner must prove that he suffered "actual injury" because he was denied such access. *Id.* at 350-55. To prove an actual injury, he must show that the actions of prison officials hindered his efforts to pursue a non-frivolous claim concerning his conviction or conditions of confinement. *See id.* at 354-55.

Here, Plaintiff has presented no evidence to support his assertion that he suffered an actual injury to court access as a result Defendants Beard, Medina, and Mojica alleged actions of obstructing the aforementioned grievances. Case in point, Plaintiff cannot demonstrate any actual access-to-courts injury because he is litigating his underlying claims from those grievances in the present civil rights matter. Despite his claims of obstruction, Plaintiff's claims are now before the Court. Plaintiff's mere dissatisfaction with the handling of the aforementioned grievances cannot establish a constitutional violation. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (holding that a prison official's involvement in the handling of inmate appeals, without more, is not actionable under section 1983). Furthermore, Plaintiff cannot prove prejudice regarding any contemplated or existing litigation, such as the failure or inability to meet a filing deadline. *See Lewis*, 518 U.S. at 348-49. Accordingly, Plaintiff's access to the courts claim fails as a matter of law. Therefore, Defendants are entitled to summary judgment as to Plaintiff's claim of denial of access to the court against Defendants Beard, Medina, and Mojica.

## III.   CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.      The Court GRANTS Defendants' motion for summary judgment based on the failure to exhaust administrative remedies as his claims against Defendants Grounds and Warren. Dkt. 34. The aforementioned claims are DISMISSED without prejudice to refiling after exhausting California's prison administrative process. *See McKinney v. Carey*, 311 F.3d 1198, 1199-1201 (9th Cir. 2002).

2.      The Court GRANTS Defendants' motion for summary judgment as to the

following remaining claims[10]:

    a.    Plaintiff's Eighth Amendment deliberate indifference claim to mental health needs against Defendant Sanders;

    b.    Plaintiff's Eighth Amendment claim of deliberate indifference to Plaintiff's safety needs again Defendants Beard, Medina, Mojica, Sanders, Howard, Kessler, Solis, Moon, and Johnson;

    c.    Plaintiff's claims against Defendant Howard, including (1) an Eighth Amendment deliberate indifference to serious medical needs claim; (2) First Amendment access to the courts claim; and (3) equal protection claim; and

    d.    Plaintiff's First Amendment access to the courts claim against Defendants Beard, Medina, and Mojica.

4.    As explained above, Defendant Mejia's motion for summary judgment has not yet been fully brief. As such, there are still remaining claims against Defendant Mejia. The Court will resolve Defendant Mejia's pending motion for summary judgment after it is fully briefed and in a separate Order. When a final judgment is entered, it will include a judgment in favor of Defendants Beard, Medina, Mojica, Sanders, Howard, Kessler, Solis, Moon, and Johnson and against Plaintiff.

5.    This Order terminates Docket No. 34.

IT IS SO ORDERED.

Dated: September 23, 2015

_____
YVONNE GONZALEZ ROGERS
United States District Judge

---

[10] The Court's finding that Defendants are entitled to summary judgment as a matter of law on Plaintiff's remaining claims obviates the need to address these Defendants' alternative arguments regarding their entitlement to qualified immunity.

United States District Court
Northern District of California